# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,       )
                              )
            Plaintiff,      )
                              )
                              )
     v.                      )     Cr. ID. No. 1603013733
                              )
                              )
JOSE MORETA,         )
                              )
            Defendant.   )

Submitted: November 29, 2021
Decided: February 23, 2022

## COMMISSIONER'S REPORT AND RECOMMENDATION THAT DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF SHOULD BE DENIED

Andrew J. Vella, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, Attorney for the State.

Eugene J. Maurer, Jr., Esquire, 1201-A King Street, Wilmington, Delaware, Attorney for Defendant Jose Moreta

PARKER, Commissioner

This 23rd day of February 2022, upon consideration of Defendant's Motion for Postconviction Relief, it appears to the Court as follows:

## BACKGROUND AND PROCEDURAL HISTORY

Following a seven-day trial, on January 17, 2018, a Superior Court jury convicted Defendant Jose Moreta of murder, attempted murder, and related charges for his role in the shooting death of Christian Serrano and the wounding of Jerry DeLeon following a confrontation in the City of Wilmington on March 17, 2016.

The Superior Court granted Moreta's motion for judgment of acquittal on the charge of Aggravated Act of Intimidation.[1] The Superior Court jury found Moreta not guilty of resisting arrest.[2] Moreta was found guilty on all remaining charges except burglary second degree, for which he was convicted of a lesser included offense of criminal trespass.[3]

On May 25, 2018, Moreta was sentenced to life imprisonment plus 27 years at Level V incarceration, followed by decreasing levels of probation.

---

[1] See, Superior Court Docket No. 65.
[2] January 17, 2018 Trial Transcript, at pg. 5.
[3] January 17, 2018 Trial Transcript, at pg. 5.

Moreta filed a direct appeal to the Delaware Supreme Court. On April 19, 2019, the Delaware Supreme Court determined that the appeal was without merit and affirmed the judgment of the Superior Court.[4]

On April 10, 2020, Moreta, with the assistance of counsel, filed the pending Rule 61 motion.

## FACTS

On March 17, 2016, 22-year-old Christian Serrano was shot and killed, and Jerry DeLeon was shot and wounded following a confrontation in the City of Wilmington. At trial, it was undisputed that co-defendant Joshua Gonzalez was the gunman.[5]

Joshua Gonzalez was charged in the same indictment as Moreta, but the two cases were severed and tried separately. Gonzalez was convicted of murder for the shooting death of Serrano and of attempted murder for the shooting of DeLeon.[6]

There was no question that Gonzalez held the gun and fired the bullets which killed Serrano and wounded DeLeon. All eight shots were fired from the same gun. There was also no question that Moreta was with Gonzalez at the time

---

[4] *Moreta v. State,* 2019 WL 1752616 (Del.).

[5] January 16, 2018 Trial Transcript, at pgs. 39-40; May 25, 2018 Sentencing Transcript, at pg. 5, 9, 18, 20; January 9, 2018 Trial Transcript, at pgs. 121.

[6] See, *State v. Joshua Gonzalez,* Super.Ct. ID No. 1604016007; *Gonzalez v. State,* 2018 WL 6015782 (Del.).

2

of the shooting.[7] The only issue, the crux of Moreta's defense, was whether Joshua Gonzalez was acting at Moreta's bidding or on his own at the time of the shooting.

The testimony presented at trial was that about two hours before the shooting, Joshua Gonzalez and Jose Moreta along with two other males ran into Hector Guzman.[8] Guzman and Moreta did not get along. Guzman had no issues with Gonzalez.[9]

Moreta and Guzman exchanged heated words upon running into each other. Following that heated exchange, Moreta made a motion to Gonzalez something to the effect of "move out of the way, I'm about to light the block up."[10] Guzman started to run away. One of the other individuals with Moreta and Joshua Gonzalez started chasing Guzman. That individual drew his gun but the gun jammed.[11] Guzman testified that as he was running away, his shoe fell off and he dropped his phone.[12] Guzman made it clear that another individual, not Gonzalez or Moreta, chased him with a gun. Guzman also testified that he never saw Moreta with a gun.[13]

---

[7] January 9, 2018 Trial Transcript, at pg. 34-35.
[8] January 9, 2018 Trial Transcript, at pgs. 150-153.
[9] January 9, 2018 Trial Transcript, at pgs. 148-55.
[10] January 9, 2018 Trial Transcript, at pgs. 156-157, 172-175.
[11] January 9, 2018 Trial Transcript, at pgs. 148-159, 170-175.
[12] January 9, 2018 Trial Transcript, at pgs. 56, 157-159, 170.
[13] January 9, 2018 Trial Transcript, at pgs. 157, 170.

3

After hearing about Guzman's confrontation earlier in the day, Jerry DeLeon, Christian Serrano and Alfredo Gonzalez[14] went to find out what was going on and why Guzman was being targeted.[15] They came in contact with Moreta and Joshua Gonzalez. DeLeon had no issues with Gonzalez. He did not like and did not get along with Moreta.[16] In fact, minutes before the shooting Gonzalez is captured on video surveillance shaking hands with Christian Serrano.[17]

Jerry DeLeon and Moreta engaged in a conversation. During the conversation, Jerry DeLeon was getting verbally aggressive with Moreta.[18] Moreta suggested that they continue their discussions in a back alley. DeLeon would not agree to go into the back alley because he had a feeling something bad was going to happen.[19] As the conversation got heated, Moreta turned to Joshua Gonzalez and said, "hit him." Although "hit him" could mean different things to different people, from the statement Moreta gave to the police, he explained that to him "hit him" meant "shoot him."[20] Jerry DeLeon punched Moreta before Gonzalez acted.[21]

---

[14] Because Alfredo has the same last name as co-defendant Joshua Gonzalez, Alfredo will be referred to hereinafter as "Alfredo" to avoid any potential confusion.
[15] January 9, 2018 Trial Transcript, at pgs. 114.
[16] January 9, 2018 Trial Transcript, at pgs. 110-112.
[17] January 9, 2018 Trial Transcript, at pg. 60.
[18] January 9, 2018 Trial Transcript, at pg. 60.
[19] January 9, 2018 Trial Transcript, at pgs. 114-116.
[20] January 12, 2018 Trial Transcript, at pgs. 9-10, 24.
[21] January 9, 2018 Trial Transcript, at pgs. 115-16.

4

Everything came to a standstill. Moreta stood there in shock and Christian, Jerry and Alfredo left the confrontation and started walking away.[22]

While walking up the street, DeLeon, Serrano and Alfredo noticed that they were being followed by Moreta and Joshua Gonzalez. They told Alfredo to break away and run ahead to tell everybody to get inside.[23] While DeLeon and Serrano continued to walk up the street, eight shots were fired down North Connell Street in their direction. DeLeon was shot in the arm and Serrano was fatally shot in the head.[24]

Upon hearing the shots, a bystander, Krista Saucier, looked out her window on Connell Street and saw Moreta and Gonzalez running away. She grabbed her phone and took a photograph of them. Moreta was wearing a black jacket and khaki pants. Gonzalez was wearing a white shirt and khaki pants. She saw Gonzalez drop the gun, pick it up, and continue running.[25]

Police officers just happened to be in the area on an unrelated call. When they heard the shots, a police officer spotted Moreta running and gave chase. Moreta ran into a nearby residence and while there removed his black jacket and

---

[22] January 9, 2018 Trial Transcript, at pgs. 116-117.
[23] January 9, 2018 Trial Transcript, at pgs. 118-119; January 9, 2018 Trial Transcript, at pgs. 203-04.
[24] January 9, 2018 Trial Transcript, at pgs. 121-122, 145.
[25] January 10, 2018 Trial Transcript, at pgs. 32-40.

threw it under a bed.[26]  Moreta told the residents not to tell the police he was there. Within minutes after the shooting the police arrested Moreta.[27]

After the shooting, Moreta and Gonzalez both fled the scene.  Gonzalez ran in an opposite direction and evaded arrest that day. Two days later, on March 19, 2016, the firearm used in the shooting was found in a backyard along the path where Gonzalez had fled.[28]  It would have been impossible for Moreta to have placed the gun in the backyard where it was recovered. The gun was located along Gonzalez's path of flight.[29]

On March 19, 2016, Gonzalez posted on Facebook and stated that he was putting people in boxes and that people best not mess with him and his gang.[30]  As previously discussed, he was eventually arrested and tried and convicted of murder and related charges.

Surveillance cameras captured much of the activity that day.[31] Video surveillance and still photographs showed Moreta and Gonzalez together as early

---

[26] January 10, 2018 Trial Transcript, at pgs. 7-9, 128, 131-32; January 11, 2018 Trial Transcript, at pg. 51-54, 57-64.
[27] January 10, 2018 Trial Transcript, at pgs. 128-132; January 11, 2018 Trial Transcript, at pg. 51-54, 57-64.
[28] January 10, 2018 Trial Transcript, at pg. 60, 77-78; January 10, 2018 Trial Transcript, at pgs. 110-117; January 12, 2018 Trial Transcript, at pgs. 86, 93; January 16, 2018 Trial Transcript, at pg. 41.
[29] January 11, 2018 Trial Transcript, at pg. 98.
[30] January 12, 2018 Trial Transcript, at pgs. 42-44; January 16, 2018 Trial Transcript, at pg. 53.
[31] January 9, 2018 Trial Transcript, at pgs. 46-107.

as 2:20 p.m. that day and up to moments before the shooting.[32] Video surveillance captured Guzman running and he appeared to be missing a shoe.[33] Video surveillance captured the meeting between Moreta and Gonzalez and DeLeon, Serrano and Alfredo.[34] Video surveillance captured the confrontation between Moreta and Jerry DeLeon.[35] Video surveillance captured the physical altercation between Jerry DeLeon and Moreta. Video surveillance captured Moreta and Gonzalez following at a distance Jerry DeLeon, Chris Serrano and Alfredo after the physical altercation. Video surveillance captured Moreta and Gonzalez together just prior to the shooting at 6:33 p.m.[36] The shooting itself was not captured on video but a photograph was taken by Ms. Saucier immediately after the shooting showing Moreta and Gonzalez fleeing the scene. Video surveillance captured Moreta being taken into custody shortly after the shooting.[37]

Moreta gave two statements to the police.[38] Apparently unaware that his movements were captured on surveillance cameras, and that there were multiple videos of him with Gonzalez for much of the day, during his first interview, he denied even knowing Gonzalez. He concocted a story that it was he who was the

[32] January 9, 2018 Trial Transcript, at pgs. 50-68.
[33] January 9, 2018 Trial Transcript, at pg. 56.
[34] January 9, 2018 Trial Transcript, at pg. 58.
[35] January 9, 2018 Trial Transcript, at pg. 60.
[36] January 9, 2018 Trial Transcript, at pg. 56.
[37] January 9, 2018 Trial Transcript, at pgs. 68-69.
[38] January 12, 2018 Trial Transcript, at pgs. 9-10.

7

victim and that he was running for his life because someone was shooting at him.[39]

During his second interview, Moreta continued to deny he was with Gonzalez, claiming to have been with a "Chris".[40]

After he was confronted with video surveillance that dispositively established he was with Gonzalez all day, Moreta changed his story. Moreta admitted that there was no "Chris" and that he had been with Gonzalez. Moreta admitted that he knew Gonzalez, and that he was with Gonzalez during that day, but continued to deny that he was with Gonzalez at the time of the shooting.[41]

It was undisputed at trial that Gonzalez was the triggerman but it was also undisputed that Moreta had stood close enough to Gonzalez at the time of the shooting that he had gunshot residue on his hand.[42] Given the video footage that showed Gonzalez and Moreta together just prior to the shooting and the photo taken by the bystander immediately after the shooting that showed them both fleeing, it was undisputed that they had been together at the time of the shooting and that they both fled the scene immediately thereafter.

As to the relationship between Moreta and Gonzalez, Guzman testified that Gonzalez and Moreta were always together. Guzman did not get along with

---

[39] May 25, 2018 Sentencing Transcript, at pg. 19; January 12, 2018 Trial Transcript, at pgs. 9-49; January 16, 2018 Trial Transcript, at pgs. 39-40.

[40] January 12, 2018 Trial Transcript, at pg. 49; January 16, 2018 Trial Transcript, at pgs. 85-90; Sentencing Transcript, at pgs. 19-20.

[41] January 12, 2018 Trial Transcript, at pg. 49; May 25, 2018 Sentencing Transcript, at pgs. 19-20.

[42] January 10, 2018 Trial Transcript, at pgs. 162, 166-68, 170, 182-83.

Moreta.  He had no issues with Gonzalez.[43]   Guzman knew Gonzalez as Moreta's puppet, his pet.  Gonzalez told Guzman that he was scared of Moreta.  Whatever Moreta told Gonzalez to do, he did.[44]

Jerry DeLeon likewise testified that he also had no issues with Gonzalez and that they would occasionally spend time together.[45] In fact, minutes before the shooting, Gonzalez is seen on video surveillance shaking the hand of Chris Serrano.  Jerry DeLeon testified that he did not like and was not friends with Moreta.[46]  DeLeon also testified that Gonzalez did whatever Moreta told him to do.[47] DeLeon testified that during his heated conversation with Moreta, it was Moreta (not Gonzalez) who suggested that they go into a back alley to continue their discussion, and it was Moreta who told Gonzalez to "hit him", to shoot him.[48] Moreta was the one that got into the physical altercation with Jerry DeLeon.

In fact, even Moreta himself, in his statement to the police, referred to Gonzalez as his young boy.[49]

The evidence at trial fairly established that Gonzalez looked up to Moreta, listened to him, and did what Moreta told him to do.  The evidence at trial fairly

---

[43] January 9, 2018 Trial Transcript, at pgs. 148-55.
[44] January 9, 2018 Trial Transcript, at pgs. 150-154.
[45] January 9, 2018 Trial Transcript, at pgs. 110, 140-42.
[46] January 9, 2018 Trial Transcript, at pgs. 110-111.
[47] January 9, 2018 Trial Transcript, at pgs. 111-12.
[48] January 9, 2018 Trial Transcript, at pgs. 110-116.
[49] See, January 16, 2018 Trial Transcript, at pg. 45; January 12, 2018 Trial Transcript, at pgs. 9-12.

established that Moreta was the leader in this situation and ordered the "hit" that killed Serrano and wounded DeLeon.

## MORETA'S RULE 61 MOTION

On April 10, 2020, Moreta, with the assistance of counsel, filed the pending Rule 61 motion. In the subject motion, Moreta initially asserted six ineffective assistance of counsel claims. After the filing of the motion, the Court set a briefing schedule. When Moreta filed his opening brief in support of his Rule 61 motion, he advised that he was moving forward on only four of the initial six grounds asserted.

Accordingly, Moreta has presented four ineffective of assistance counsel claims for resolution. These claims include counsel ineffectiveness for:

(1) failing to object to portions of Hector Guzman's testimony;

(2) failing to object to Detective Fox's "narrative" testimony;

(3) failing to object to Detective Fox's "expert" testimony regarding social media and street slang; and

(4) failing to object to the prosecutor's remarks in closing about the social media evidence admitted at trial.

Before making a recommendation, the record was enlarged and Moreta filed an opening brief in support of his Rule 61 motion. Thereafter, trial counsel

submitted an affidavit responding to Moreta's claims. The State submitted a response and Moreta submitted a reply thereto.

In order to prevail on an ineffective assistance of counsel claim, Moreta must meet the two-pronged *Strickland* test by showing that: (1) counsel performed at a level "below an objective standard of reasonableness" and that, (2) the deficient performance prejudiced the defense.[50]

The first prong requires the defendant to show by a preponderance of the evidence that defense counsel was not reasonably competent, while the second prong requires him to show that there is a reasonable probability that, but for defense counsel's unprofessional errors, the outcome of the proceedings would have been different.[51]

Mere allegations of ineffectiveness or conclusory statements will not suffice; instead, a defendant must make and substantiate concrete allegations of actual prejudice.[52] The court must be persuaded that the alleged errors were so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment.[53] The test is not whether the defendant can demonstrate

---

[50] *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).
[51] *Id.* at 687-88, 694.
[52] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990); *State v. Gonzalez,* 2019 WL 1762976, *1 (Del.).
[53] *State v. Gonzalez,* 2019 WL 1762976, *1 (Del.).

that the error had some "conceivable effect" on the outcome but rather whether the error undermined the reliability of the result of the proceeding.[54]

Although not insurmountable, the *Strickland* standard is highly demanding and leads to a strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance.[55] Moreover, there is a strong presumption that defense counsel's conduct constituted sound trial strategy.[56]

In considering post-trial attacks on counsel, *Strickland* cautions that trial counsel's performance should be reviewed from the defense counsel's perspective at the time decisions were being made.[57] It is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.[58] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting efforts of hindsight. Second guessing or "Monday morning quarterbacking" should be avoided.[59]

With this backdrop in mind, we turn to Moreta's specific claims.

At the outset it is noted that based on the video surveillance, photographs, and eyewitness testimony, it was undisputed that Gonzalez was the gunman, and

---

[54] *State v. Gonzalez,* 2019 WL 1762976, *1 (Del.).
[55] *Albury v. State*, 551 A.2d 53, 59 (Del. 1988); *Salih v. State*, 2008 WL 4762323, at *1 (Del. 2008).
[56] *Strickland v. Washington,* 466 U.S. 668, 689 (1984).
[57] *Strickland*, 466 U.S. at 688-89.
[58] *Strickland*, 466 U.S. at 688-89.
[59] *Strickland*, 466 U.S. at 688-89.

that he shot and killed Serrano and injured DeLeon. It was also undisputed that Moreta was with Gonzalez at the time of the shooting. The crux of Moreta's defense was that Gonzalez was acting on his own at the time of the shooting. That Gonzalez was trying to impress Moreta by committing the shooting and then bragging about it. The trial strategy was to establish reasonable doubt that at the time of the shooting Gonzalez was acting as a puppet of Moreta acting at his command.[60]

### Claim I: Failing to Object to Portions of Hector Guzman's Testimony

Moreta claims that trial counsel was ineffective for not objecting to the portion of Guzman's testimony that he was chased by an unknown associate of Moreta who displayed and attempted to fire a gun at him. Moreta also contends that counsel should have requested a limiting jury instruction for this evidence. Moreta claims Guzman's testimony about being chased by Moreta's associate amounted to inadmissible prior bad act evidence under DRE 404(b).

In response to this claim, Moreta's trial counsel advised that he did not recall whether he considered making an objection to Guzman's testimony, but noted that, "the evidence in total suggested that Guzman may not have actually been chased by anyone, thereby further calling into question [his] reliability and credibility."[61]

---

[60] Superior Court Docket No. 103- Affidavit of Trial Counsel in response to Rule 61 motion.
[61] Superior Court Docket No. 103- Affidavit of Rule 61 Counsel, at pgs. 1-2.

It was within trial counsel's broad range of discretion to withhold an evidentiary objection in favor of assessing the credibility of the totality of Guzman's testimony and later arguing that it was replete with inconsistencies, defied common sense, and was motivated by a bias against Moreta. That is what trial counsel opted to do here.[62]

Moreover, Guzman testified that it was someone other than Moreta that was alleged to have chased Guzman and attempted to shoot at him. This testimony does not appear to be either particularly helpful or harmful to Moreta's defense. There was no testimony that the unknown associate was acting at Moreta's bidding, or that he had been ordered to chase Guzman at Moreta's command. Guzman's testimony merely provided the context for the events that occurred later in the day. Guzman's statement in this regard did not do much to move the needle in either direction on the central issue as to whether Gonzalez was acting on his own or at Moreta's bidding at the time he shot and killed Serrano and wounded DeLeon.

Trial counsel chose not to object to this testimony in order to use it along with the rest of Guzman's testimony to question Guzman's credibility. Trial counsel did, in fact, question Guzman's credibility and also reinforced that it was

---

[62] See, January 16, 2018 Trial Transcript, at pgs. 65-68.

someone other than Moreta that allegedly chased Guzman.[63] Trial counsel must be given wide latitude in making tactical decisions. Great weight and deference are given to tactical decisions by the trial attorney. There is a strong presumption that defense counsel's conduct was reasonable and constituted sound trial strategy.[64] There are countless ways to provide effective assistance in any given case.[65] Even the best criminal defense attorneys would not defend a particular client in the same way.[66]

Moreta's trial counsel made a reasonable strategic decision. Perhaps reasonable minds may differ and another attorney defending Moreta may have made a different decision in deciding whether to object to this portion of Guzman's testimony. Moreta has not met his burden to overcome the strong presumption that trial counsel's conduct was reasonable and constituted sound trial strategy.

Regardless of trial counsel's strategy, it does not appear that Moreta would have prevailed on an objection to this portion of Guzman's testimony. Evidence of a defendant's uncharged bad acts is not admissible to prove propensity or support a general inference of bad character but may be admissible when it has independent

---

[63] January 16, 2018 Trial Transcript, at pgs. 66-67.

[64] *Harrington v. Richter,* 131 S.Ct. 770 (2011); *Outten v. State,* 720 A.2d 547, 557 (Del. 1998); *Strickland v. Washington,* 466 U.S. 668, 689 (1984).

[65] *Harrington v. Richter,* 131 S.Ct. 770, 787-788 (2011).

[66] *Harrington v. Richter,* 131 S.Ct. 770 (2011); *Outten v. State,* 720 A.2d 547, 557 (Del. 1998); *Strickland v. Washington,* 466 U.S. 668, 689 (1984).

logical relevance and when its probative value is not substantially outweighed by the danger of unfair prejudice.[67] Such was the situation presented herein.

Guzman's testimony as a whole provided the context for the events that occurred two hours later when Moreta and Gonzalez were confronted by Guzman's friends seeking an explanation as to why they were after Guzman. Guzman's testimony is relevant and admissible in this regard. The probative value was not outweighed by any potential unfair prejudice. Moreta cannot establish that the trial court would have granted an objection to this portion of Guzman's testimony had an objection been made.

In addition, any objection to Guzman's testimony, even if successful would not have led to a different result here. The focus of the trial was on Moreta's relationship with Gonzalez. The objected to portion of Guzman's testimony did not address Moreta's relationship with Gonzalez in any respect. Moreta cannot demonstrate actual prejudice. Any error, to the extent there was any error, was harmless.[68]

Moreta has failed to establish that his trial counsel was deficient for not objecting to a portion of Guzman's testimony or that he suffered actual prejudice as a result thereof. This claim is without merit.

---

[67] *Getz v. State,* 538 A.2d. 726, 730 (Del. 1988).
[68] *Wilson v. State,* 2022 WL 212692, *4 (Del.)(an error in admitting evidence may be deemed harmless when the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction.).

16

## Claim II- Failure to Object to Detective Fox's "Narrative" Testimony

Moreta claims that trial counsel was ineffective for failing to object to Detective Fox's testimony regarding some of the video surveillance introduced into evidence on the grounds that it improperly and prejudicially furthered the State's theory of the case.

On the first day of trial, the State introduced 27 videos and still photographs that were taken from various surveillance cameras in the city on the day of the shooting.[69] The videos showed Moreta's and Gonzalez's movements starting around three hours prior to the shooting up until Moreta was arrested shortly after the shooting. The videos did not capture the shooting itself.

During the introduction of the video footage and still photographs, Moreta contends that Detective Fox's use of the terms "in front" and "conversation" somehow advanced the theory of the State's case and portrayed Moreta as a leader and puppeteer.

Despite Moreta's contention that Detective Fox's testimony somehow communicated to the jury that Moreta was the leader of the group, a review of Detective Fox's trial testimony shows that he did little more than identify the individuals depicted in the video surveillance clips, describe their locations and position in relation to one another and suggested that there was a "conversation"

---
[69] January 9, 2018 Trial Transcript, at pgs. 46-107.

occurring in one video clip.  Identification of the individuals on the video clips was not at issue in this case.  Nor was it disputed that it was Moreta and DeLeon that had a conversation while the others stood around.  Detective Fox merely identified the individuals on the videos.

In various video clips, Detective Fox described Moreta's relative position among the individuals depicted in the video surveillance clips as "in front" while walking, or in front of the camera shot with others "behind" him.  Detective Fox's description of Moreta's relative body position was not lay opinion testimony- it was a description made in connection with Detective Fox's identification of the individuals depicted in the videos.  Detective Fox never offered any opinion that Moreta was the leader of the group.

In one video clip, Detective Fox described the interaction between Moreta and DeLeon as having a "conversation."[70]  Moreta contends that this testimony somehow suggests that Gonzalez was Moreta's puppeteer. This contention is without merit.

It was undisputed that Moreta and DeLeon had a conversation and that everybody else stood around watching. Detective Fox did not speculate or elaborate as to the content of the conversation.  He merely indicated that the video

---

[70] January 9, Trial Transcript, at pg. 60.

18

clip captured Moreta and DeLeon having a conversation. Detective Fox did not express any opinion as to what they were saying or thinking.

In this case, the narrative testimony during the video presentation did not go beyond what was necessary to lay the foundation for the video's admission and to present an uncontroversial explanation of what the video depicted. The detective identified the different cameras and described the areas captured by the camera.

Moreta has not identified a single question asked by the prosecutor during the video presentation testimony as an instance of misconduct. Detective Fox's testimony was uncontroversial.

It does not appear that Detective Fox's testimony qualified as lay opinion testimony. His use of the terms "in front" and having a conversation did not advance the theory of the State's case, it merely identified the people depicted in the surveillance footage. To the extent it did constitute lay opinion testimony, any error in its admission was harmless. There was no rational basis to believe that the jury was somehow unduly influenced by Detective Fox's brief testimony. Any error in admitting evidence may be deemed to be harmless when the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction.[71]

---

[71] See, *Wilson v. State,* 2022 WL 212692, *4 (Del.); *Cooke v. State,* 97 A.3d 513, 547 (Del. 2014); *Saavedra v. State,* 225 A.3d 364, 384-385 (Del. 2020).

Here, even if the trial court did not permit Detective Fox to testify about the content of the video surveillance, the jury would have viewed the surveillance footage and seen that Moreta was physically positioned "in front" of some of his associates, and the jury would have heard about the "conversation" between DeLeon and Moreta when DeLeon testified. DeLeon testified that he and Moreta had a conversation that turned into a confrontation. This fact was not in dispute. Any error in admitting Detective Fox's "narrative" testimony was harmless.[72]

Moreta has failed to establish that his trial counsel was deficient for not objecting to Detective Fox's "narrative" testimony or that he suffered actual prejudice as a result thereof. This claim is without merit.

**Claim III: Failure to Object to Social Media and Street Slang Testimony**

Moreta claims that trial counsel was ineffective for failing to object to Detective Fox's testimony regarding certain slang terms used in social media posts. Moreta contends that Detective Fox's testimony amounted to expert testimony and that trial counsel's failure to object on that basis relieved the State of its burden to make a pretrial disclosure and lay a proper foundation for his testimony at trial.

Detective Fox during his testimony explained the meaning of certain terms used in some of the social media posts introduced into evidence.[73] Detective Fox testified that his understanding of the meaning of the street slang used in the social

---

[72] See, *Cooke v. State,* 97 A.3d 513, 547 (Del. 2014).
[73] See, January 12, 2018 Trial Transcript, at pgs. 33-44.

media posts was based on his training and experience, his familiarity with commonly used slang and his investigation in this case.[74]

In the first instance, Moreta's trial counsel objected to the admission of all the social media posts sought to be admitted at trial by the State on the basis that the posts were inflammatory and prejudicial in nature.[75] Trial counsel's objection was sustained as to some of the social media posts and other text submissions were partially redacted. The social media posts that were permitted to be admitted at trial were allowed to be introduced for the limited purpose of establishing a connection between Moreta and Gonzalez as to conspiracy and accomplice liability.[76] The trial judge gave a limiting instruction that the social media posts were being admitted solely for the purposes of conspiracy and accomplice liability theories.[77]

Specifically, the State used Gonzalez's Facebook post and an Instagram post by Moreta to respond to Moreta's claim that he was not associated with Gonzalez at the time of the shooting. The two posts used the same hashtags and referred to M.O.E.T. ("Money Over Everything", a group that included Moreta and Gonzalez).[78] Thus, the posts assisted the State in proving accomplice liability and

---

[74] January 12, 2018 Trial Transcript, at pg. 35.
[75] January 2, 2018 Final Case Review/Pretrial Conference, at pgs. 13-60.
[76] January 8, 2018 Trial Transcript, at pgs. 8-11; January 11, 2018 Trial Transcript, at pgs. 100-102; January 12, 2018 Trial Transcript, at pgs. 4-8, 41, 96.
[77] January 12, 2018 Trial Transcript, at pg. 41.
[78] *Moreta v. State,* 2019 WL 1752616, * 2 (Del.).

a conspiracy. To mitigate prejudice to Moreta- where the jury might imply that Moreta and Gonzalez had shot someone recently- the trial court gave a limiting instruction telling jurors to confine their use of the posts to accomplice liability and conspiracy.[79]

The slang terms were embedded in and incidental to these social media posts that were introduced into evidence at trial for the limited purpose of establishing conspiracy and accomplice liability.

Trial counsel advised that he had considered making an objection to Detective Fox's testimony as to the meaning of the slang terms used in the social media posts, but expected it to be overruled, and did not want to highlight the evidence more by doing so.[80] Trial counsel further advised that Detective Fox's testimony as to his understanding of the meaning of the street slang was identical to his own understanding of the posts at issue and was also consistent with common sense interpretations of that language.[81]

Whether or not the testimony constituted expert testimony does not need to be decided herein because any error in the admission of this testimony was

---

[79] *Moreta v. State,* 2019 WL 1752616, * 2 (Del.).
[80] Superior Court Docket No. 103- Affidavit of Rule 61 Counsel, at pg. 2; See, *Ayers v. State,* 2017 WL 2729563 (Del.)(denying trial counsel's objection to the Special Agent's testimony about the meaning of slang expressions heard on wiretap recordings); See also, *Saavedra v. State,* 225 A.3d 364, 384-385 (Del. 2020) (the translation of a slang term even if it constituted expert testimony and even if improperly admitted, was harmless error).
[81] Superior Court Docket No. 103- Affidavit of Rule 61 Counsel, at pgs. 2.

harmless.[82]   Trial counsel understood the slang terms to mean precisely what Detective Fox testified those terms to mean.  Moreta cannot sustain his burden to establish actual prejudice as a result of the admission of this testimony.[83]

Additionally, an error in admitting evidence may be deemed to be harmless when the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction.[84] The evidence Moreta complains of here was only relevant to demonstrate the conspiracy between Moreta and Gonzalez.  Aside from the slang terms, there was other ample evidence to support a finding of conspiracy and accomplice liability. The link between Gonzalez and Moreta was established by the testimony of witnesses who described their relationship and how they acted in concert on the day of the murder.  The video surveillance reinforced the contention that Moreta and Gonzalez pursued a course of conduct together that culminated in Serrano's murder.

Moreta has not established how the exclusion of Detective Fox's testimony regarding the slang terms, which were embedded in the social media posts introduced into evidence for a limited purpose, would have likely produced a different result in his trial.  Moreta failed to establish that his counsel's actions

---

[82] See, *Saavedra v. State,* 225 A.3d 364, 384-385 (Del. 2020) (the translation of a slang term even if it constituted expert testimony and even if improperly admitted, was harmless error).
[83] *Wilson v. State,* 2022 WL 212692, *4 (Del.).
[84] *Saavedra v. State,* 225 A.3d 364, 384-385 (Del. 2020)(setting aside the objected to testimony there was ample evidence including video evidence and eyewitness identifications that defendant killed somebody to sustain the defendant's convictions).

23

were deficient or that he suffered actual prejudice as a result thereof.  This claim is without merit.

## Claim IV: Failure to Object to Prosecutorial Misconduct

Moreta's fourth and final claim is that trial counsel was ineffective when he failed to object to one of the prosecutor's comments in closing.  He contends that the prosecutor's description of Gonzalez's social media post admitted into evidence as bragging about what he just did for his buddy by shooting DeLeon amounted to prosecutorial misconduct to which trial counsel should have objected.

Moreta contends that the State improperly used the post to show substantively that the act had been committed- that Gonzalez shot the victim and did so for Moreta.

It is important to emphasize that trial counsel objected to the admission of this post in the first instance and believed that it should have been kept out of the evidence entirely given the extremely inflammatory and prejudicial nature of the post.[85]  Trial counsel's objection was overruled as to this social media post.[86]  The social media post was introduced at trial for the limited purpose of establishing a

---

[85] January 2, 2018 Final Case Review/Pretrial Conference, at pgs. 26-45.
[86] January 8, 2018 Trial Transcript, at pgs. 8-11

24

connection between Moreta and Gonzalez on the conspiracy and accomplice liability theories.[87]

The admission of this social media post was an issue raised on direct appeal to the Delaware Supreme Court. The Delaware Supreme Court affirmed the admissibility of the social media posts for the limited purpose of establishing accomplice liability and conspiracy.[88]

In response to Moreta's Rule 61 claim, trial counsel advised that he found the social media post to be more exculpatory rather than inculpatory and therefore did not object to the use of the post in the State's closing.[89] The evidence at trial was overwhelming that Moreta and Gonzalez were together all day up until the time of the shooting, that they stood together at the time of the shooting, and then both fled the scene immediately after the shooting. Moreta's only defense was that Gonzalez was acting on his own at the time of the shooting. Defense counsel believed that the fact that two days after the shooting Gonzalez was bragging about having committed the shooting, that he was continuing to seek Moreta's approval by looking tough, was more helpful rather than harmful to the crux of Moreta's

---

[87] January 8, 2018 Trial Transcript, at pgs. 8-11; January 11, 2018 Trial Transcript, at pgs. 100-102; January 12, 2018 Trial Transcript, at pgs. 4-8, 41, 96; *Moreta v. State,* 2019 WL 1752616, *2 (Del.)(the admissibility of the social media posts affirmed on direct appeal).

[88] *Moreta v. State,* 2019 WL 1752616, *2 (Del.).

[89] Superior Court Docket No. 103- Affidavit of Trial Counsel in response to Rule 61 motion, at pgs. 2-3.

defense.[90]   It fit the defense theory that Gonzalez was acting alone at the time of the shooting and was trying to impress Moreta.[91]

In fact, the post was helpful enough to Moreta's defense that Moreta's trial counsel even referred to this social media post in his own closing.   Moreta's counsel stated: "Josh [Gonzalez], two days after the shooting, he posts some stupid message. He just shot and killed somebody, and he goes and brags about it. . . He's bragging about what he did.   He's still looking for acceptance and respect on his street cred for this senseless act of violence.   This is not a MOET boy shooting, ladies and gentlemen.   This is a killing at the hands of Josh Gonzalez, a wannabe looking for the respect and acceptance of Jose [Moreta]. . . Where is the evidence there was some actual agreements or conspiracy to shoot and kill anyone, that Moreta intended this?  It's not there. . . Maybe Josh [Gonzalez] just did this, maybe Jose [Moreta] didn't know he was going to do that.   That is a very reasonable possibility. . . Maybe Josh [Gonzalez] is the only one responsible for this."[92]

Defense counsel urged the jury to find that Gonzalez did the shooting on his own to impress Moreta.  He urged the jury to conclude that even though Moreta

---

[90] Superior Court Docket No. 103- Affidavit of Trial Counsel in response to Rule 61 motion, at pgs. 2-3.
[91] Superior Court Docket No. 103- Affidavit of Trial Counsel in response to Rule 61 motion, at pgs. 3.
[92] January 16, 2018 Trial Transcript, at pgs. 70-72.

was with Gonzalez at the time of the shooting, it was not Moreta's purpose or intent to shoot or kill anyone.[93]

Moreta's trial counsel did not object to the prosecutor's use of the social media post because even if it was used by the State improperly, for tactical purposes, Moreta's counsel did not believe the State's use was detrimental to Moreta's defense. Great weight and deference are given to tactical decisions by the trial attorney. There is a strong presumption that counsel's conduct was reasonable and constituted sound trial strategy.[94] Defense counsel was not ineffective in his tactical decision in this regard.

Moreover, when the State's reference to this social media post is viewed in the full context of the State's remarks, rather than in the abstract, it appears that the prosecutor's remarks did not amount to an improper use of the post.[95] It appears that the prosecutor abided by the trial court's ruling and tied his argument about this social media post to the State's overarching conspiracy/accomplice liability theory of the case. This was not a stand-alone comment in which the prosecutor used Gonzalez's social media post as substantive evidence of Moreta's guilt.

Moreta's trial counsel elected not to object to the State's use of this social media post finding it more exculpatory than inculpatory. Not only did he choose

---

[93] January 16, 2018 Trial Transcript, at pgs. 67-74.
[94] *Harrington v. Richter,* 131 S.Ct. 770 (2011); *Outten v. State,* 720 A.2d 547, 557 (Del. 1998); *Strickland v. Washington,* 466 U.S. 668, 689 (1984).
[95] January 16, 2018 Trial Transcript, at pgs. 39-60, comment at issue at pg. 53.

27

not to object to the State's use of the post, but he, himself, used the social media post in his own closing in an attempt to establish reasonable doubt as to the conspiracy/ accomplice liability theory of the State's case. Defense counsel's tactical decision was not deficient.

Moreta has also failed to demonstrate actual prejudice as a result of the State's comment at closing. The trial court instructed the jury to only consider the social media post for the purpose of assessing the State's conspiracy and accomplice liability theories. And juries are presumed to follow the court's instructions.[96] The evidence at trial fairly established that Gonzalez looked up to Moreta, listened to him, and did what Moreta told him to do. The evidence at trial fairly established that Moreta was the leader in this situation and ordered the "hit" that killed Serrano and wounded DeLeon. Any error in the use of this social media post by the State was harmless.

Moreta failed to establish that his trial counsel's strategic decision to allow the State to refer to the social media post in its closing in the context in which it did was not deficient in any respect. Moreta has also failed to establish that he suffered any actual prejudice as a result of the alleged deficiency.

---

[96] *Revel v. State,* 956 A.2d 23, 27 (Del. 2008).

28

## CONCLUSION

Moreta has failed to meet his burden to establish that defense counsel's conduct was deficient in any respect, and he has failed to establish actual prejudice as a result of any alleged deficiency. Moreta's ineffective assistance of counsel claims are without merit.

For all of the foregoing reasons, Moreta's Motion for Postconviction Relief should be DENIED.


**IT IS SO RECOMMENDED.**


 /s/ Lynne M. Parker
Commissioner Lynne M. Parker


cc:     Prothonotary
        Gregory M. Johnson, Esquire

29